**FOX ROTHSCHILD LLP**
Rory G. Greebel, Esq.
Paul Richard Brown, Esq. (to be admitted *pro hac vice*)
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: (212) 878-7900
rgreebel@foxrothschild.com
paulbrown@foxrothschild.com

*Counsel for Plaintiff, GFP Enterprises LLC*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GFP ENTERPRISES LLC *a.k.a* GFP RESPONSE LLC, <br><br> Plaintiff, <br><br> v. <br><br> GARNER ENVIRONMENTAL SERVICES, INC., G&H ENTERPRISES LLC *d/b/a* RENTALS TO GO, DJ DOCTOR LLC *d/b/a* IRENT EVERYTHING, <br><br> Defendants, <br><br> THE CITY OF NEW YORK, <br><br> Nominal Defendant | Case No. <br><br> **Jury Trial Requested** |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, GFP Enterprises LLC *a/k/a* GFP Response LLC ("Plaintiff" or "GFP"), files this Complaint against Defendants Garner Environmental Services, Inc. ("Garner"), G&H Enterprises LLC *d/b/a* Rentals to Go ("Rentals to Go"), and DJ Doctor LLC *d/b/a* iRent Everything ("iRent Everything") (collectively "Defendants") and in support thereof, respectfully shows the Court the following:

## INTRODUCTION

1.    GFP is a national turn-key rapid-response emergency management, logistics, and disaster response provider which supports not only the parties it contracts with, but also members of the public who have suffered and are suffering as a result of catastrophic events.  GFP is the last line of defense following epic disasters and is on the frontlines to prevent any further human suffering.  To that end, GFP has assisted thousands of individuals and agencies in over 4,000 disaster response occurrences: including wildland fire response missions and environmental projects. GFP has been engaged in more than 20 federally declared disasters in ten different states.

2.    At one time, Garner was a trusted business partner for GFP.  However, that changed when Garner breached its agreements with GFP and intentionally interfered with GFP's vendor relationships, as detailed herein.

3.    Defendant Rentals to Go is a former GFP vendor who conspired with Garner to replace GFP's vendors' services with its own services and to eliminate GFP's involvement in the Floyd Bennett Field and Randall's Island Asylum Seeker Facilities (hereinafter the "Asylum Seeker Facilities").

4.    Defendant iRent Everything is a former GFP vendor who also conspired with Garner to replace GFP's vendors' services with its own services and to eliminate GFP's involvement in the Asylum Seeker Facilities.

5.    The City of New York (the City) is a nominal defendant who is involved in this proceeding through the actions of Garner. Garner falsely represented on numerous occasions that it required GFP to discount GFP's rates and provide Garner with GFP's confidential cost **p**er **p**erson **p**er **d**ay ("pppd") information so Garner could allegedly pass various cost savings on to the

City. In the emergency response field "pppd" is a per capita unit of calculating the emergency response price.

6.       As will be discussed more fully below, despite Garner's false representations, upon information and belief, little if any cost savings were passed on to the City.  Instead, Garner's false representations were simply a pretext to obtain GFP confidential information to undermine and interfere with GFP's business and contractual relationships with its vendors, all with the goal of squeezing GFP out of the Asylum Seeker Facilities.

## **PARTIES**

7.       GFP is an Oregon limited liability company which is registered to do business in New York as a foreign limited liability company under the name GFP Response LLC. Donald R. Pollard, a citizen of the state of Oregon, and Ray Keener, a citizen of the state of Arizona, were owners and members of GFP at all times relevant to this action. GFP performs emergency response services in several states, including New York.

8.       Rentals to Go is a New York limited liability company performing services in several states, including New York, and may be served by its registered agent located at 80 State Street, Albany, NY, 12207. Grant Brightman, a citizen of the state of New York, was an owner and member at Rentals to Go at all times relevant to this action.

9.       Garner is a Texas corporation which is registered to do business in New York as a foreign corporation. Garner has its principal place of business in Houston, Texas, performs services in several states, including New York, and may be served by its registered agent Corporation Service Company located at 80 State Street, Albany, NY, United States, 12207, or wherever it may be found.

10.    iRent Everything is a Florida limited liability company performing services in several states, including New York, and may be served by its registered agent, Jonathan Proto, located at 9 Minnehaha Circle, Clermont, FL 34711. Jonathan Proto, a citizen of the state of Florida, was an owner and member of iRent Everything at all times relevant to this action.

11.    The City is a nominal defendant in this action whose service address is Corporation Counsel, 100 Church Street, New York, New York.

12.    Defendants Garner Environmental Services, Inc., G&H Enterprises LLC *d/b/a* Rentals to Go, and DJ Doctor LLC *d/b/a* iRent Everything, when referring to all defendants, will collectively be referred herein as "Defendants".

## JURISDICTION AND VENUE

13.    This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000 exclusive of interest and costs.

14.    Pursuant to 28 U.S.C. § 1391(a), venue is proper in the district because a substantial part of the events and conduct giving rise to the action occurred in the Southern District of New York.

## ALLEGATIONS COMMON TO ALL COUNTS

15.    Since 2000, GFP, an industry leader in the emergency mobilization space, has provided emergency housing, feeding, and comprehensive base camp fulfillment services for governments, utilities, and private companies nationwide, including, critical incident response and recovery, management, logistics, and planning services.

16.    Through its nearly 25 years of operations, GFP has developed valuable connections and relationships with a trusted network of preferred provider vendors to assist with its emergency fulfillment requirements.

17.    GFP is able to secure preferred pricing with the aforementioned vendors based on GFP's longstanding relationships with those vendors and GFP's agreement to provide "minimum guaranteed performance periods."

18.    The importance of minimum guaranteed performance periods in emergency response work cannot be overstated—it is the driving force for retaining quality subcontractors and vendors on any given project because it assures a subcontractor or vendor that they will receive a minimum guaranteed period of work and income, and it is a key element for GFP to secure preferred pricing in return from those subcontractors and vendors.

19.    Prior to the engagements at issue in this lawsuit, GFP had performed emergency mobilization and services work for Garner, including emergency mobilization assignments in New York (as a second-tier subcontractor) and Florida (as a prime subcontractor), and each prior engagement was completed without any issues.

20.    Garner had never initiated a "demobilization" of GFP or its vendors at any site in order to replace GFP's services, until the instances set forth in this Complaint.

21.    In the emergency mobilization space, "demobilization" refers to the process of removing resources, personnel, or assets and equipment from active service.

22.    While demobilization typically occurs at the end of an assignment, prime contractors such as Garner will, as a matter of custom and practice, initiate demobilizations of certain subcontractors or vendors only if specific performance issues arise during the particular engagement.

23.     After a successful and issue-free history of working together, Garner, led by a newly-inserted leadership team, sought to strongarm GFP out of two incredibly successful Asylum Seeker Facilities by: (a) undercutting its contracts; (b) refusing to pay GFP the sums owed; (c) destroying GFP's assets; (d) hoodwinking GFP into providing its confidential preferred pricing data, only to then circumvent and undercut GFP by negotiating deals directly with GFP's vendors; and (e) making it commercially impossible for GFP to continue with the Asylum Seeker Facilities by unilaterally changing the minimum guaranteed performance periods and requiring GFP to demobilize its own assets and those of its vendors.

24.     Garner's newly-inserted leadership team was ultimately forced to resign amid allegations of fraud and scandal, but not before damage to GFP was done.

25.     Former GFP vendors, Rentals to Go and iRent Everything, conspired with Garner to undercut GFP's pricing by using GFP's confidential pricing data to displace GFP out of Floyd Bennett Field and Randall's Island Asylum Seeker Facilities and replace various GFP vendors with Rentals to Go and iRent Everything's own services.

**A.  The Asylum Seeker Facilities**

26.     Like other American cities, New York City has seen a dramatic influx of displaced individuals seeking asylum since 2022.  In response, New York City Mayor Eric Adams sought help from the federal government to provide housing and other basic humanitarian needs for the displaced asylum seekers.  This litigation involves two Asylum Seeker Facilities in and around New York City.

27.     On or about August 22, 2022, GFP and Garner entered into a contract, captioned as "SUBCONTRACT AGREEMENT FOR ENVIRONMENTAL RESPONSE SERVICES" to

provide environmental response services, including those provided in connection the Asylum Seeker Facilities (hereinafter the "Master Agreement").

28.    The Master Agreement was intended to cover a wide range of potential emergency responses and services. As a result, the Master Agreement was written to cover the core parts of Garner and GFP's agreement such as insurance requirements, indemnifications, payment terms, and demobilization procedures, among others.

29.    The purchase orders defined the specific parameters of the specific emergency response services and/or assets being provided by GFP to Garner including the price to be paid by Garner to GFP, as well as the minimum performance period for those services (hereinafter the "Purchase Orders").

30.    The utilization of Purchase Orders as described above is not only the common practice of those in the emergency response industry, but also the heavily favored preferred practice.

### a. _Randall's Island_

31.    The first facility, Randall's Island, is the City's largest Asylum Seeker Facility, providing 3,000 beds over eight acres of parkland surrounded by the Harlem and East Rivers.  In October 2022, amid the aforementioned influx of displaced individuals seeking asylum, New York City mayor Eric Adams, announced that the City government would open an Asylum Seeker Facility on Randall's Island.

32.    On or about July 25, 2023, Lawrence Crowe ("Crowe"), Garner's Senior Project Manager, contacted Don R. Pollard ("Pollard"), CEO of GFP, seeking bids for the Asylum Seeker Facility at Randall's Island to hold 2,000 beds and specifically requested that GFP beat a specific cost pppd.

33.     GFP – as a sign of good will and professional courtesy – beat the requested pppd with a bid which offered a substantial discount for the goods and services to be provided. GFP submitted its bid for the first 30 days, with a further discounted rate to be applied for each 30-day renewal thereafter.

34.     On August 4, 2023, Garner accepted GFP's bid and submitted a Purchase Order for the first 30-days of performance at Randall's Island, from August 20, 2023-September 18, 2023.

35.     It was and is critically important that Garner's Purchase Orders called for 30-day performance periods because, as discussed above, GFP's vendor relationships and preferential pricing require GFP being able to provide its vendors with guaranteed minimum performance periods.  In this regard, Garner's Purchase Orders and GFP's agreements with its vendors reflected the industry custom in the emergency disaster relief space.

36.     GFP secured heavily discounted rates with its vendors based on their longstanding relationships and the 30-day minimum performance agreements, which GFP was able to pass on to Garner.[1]

37.     Immediately upon receipt of Garner's first Purchase Order on or about August 4, 2023, GFP began submitting drawings, securing permits, and obtaining engineering management, and GFP moved all necessary GFP vendor assets and personnel onto the Randall's Island Asylum Seeker Facility.

38.     On or about August 18, 2023, prior to the opening of the Randall's Island Asylum Seeker Facility, GFP received an email from Garner that an additional 1,000 beds would be needed, bringing the total number of beds at Randall's to 3,000.

---

[1] For example, GFP secured preferential pricing from a longtime vendor based upon its 30-day minimum guarantee resulting in over a 73% discount to Garner and savings in the neighborhood of $1 million every 30 days.

39.    In response to the request for an additional 1,000 beds, GFP submitted a new separate bid for the first 30 days, with a further discounted rate applied for each 30-day renewal.

40.    On the same day GFP submitted the bid for the additional 1,000 beds, Garner accepted the bid and sent GFP a revised Purchase Order.

41.    Despite the sudden 50% increase in GFP's scope of work only days prior to the Asylum Seeker Facility opening, GFP built the base camp on schedule, and Garner's executives expressed to onsite personnel that it was the best camp they had ever seen.

*b.    Floyd Bennett Field*

42.    On October 2, 2023, Garner requested that GFP submit an additional bid for a second Asylum Seeker Facility to be located at Floyd Bennett Field, a former commercial and military airfield located along the shore of Jamaica Bay in southeast Brooklyn.

43.    The Randall's Island and Floyd Bennett Field Asylum Seeker Facilities were similar insofar as they both offered temporary housing, however, the Randall's Island Asylum Seeker Facility served adults only whereas the Floyd Bennett Field Asylum Seeker Facility provided housing for displaced families.

44.    GFP submitted an extremely competitive bid for the first 30 days by leveraging its relationships and discounts – as well as by guaranteeing its vendors a minimum 30-day performance guarantee – for the benefit of Garner and the City with a further discounted rate to be applied for the next 30 days as well as each 30-day renewal thereafter.

45.    Garner accepted the bid and sent GFP a Purchase Order reflecting the pricing and terms of GFP's bid with the first 30-days to begin on November 5, 2023.

46.     The Floyd Bennett Field base camp included a long list of mandated prerequisites and necessary approvals, including but not limited to the National Park Service's approval of over ten operational plans that required detailed mobilization plans with drawings.

47.     In conjunction with GFP's mobilization of its representatives, vendors, assets, and resources for the Floyd Bennett Field Asylum Seeker Facility, GFP secured the vast majority of the engineering and provided the vast majority of approval submissions and applications for permits.

48.     Despite the exhaustive process of obtaining all engineering, permits, and approvals, GFP completed the Floyd Bennett Asylum Seeker Facility one-day ahead of schedule on November 4, 2023, all the while maintaining the Randall's Island Asylum Seeker Facility as well.

49.     However, upon completion of the Floyd Bennett Field Asylum Seeker Facility, Garner informed GFP that the City was not yet prepared to move the residents into Floyd Bennett Field, leading Garner to request a discounted "standby" rate from GFP for the period of time until residents actually moved in.

50.     GFP, as a professional courtesy to Garner, agreed to an approximate 13% discount over GFP's already heavily discounted price, as a standby rate until move-in occurred on November 11, 2023, at which time the rate returned to the approved discounted bid pricing.

**B.  GFP's Performance**

51.     For the following months, August 2023 to early March 2024, GFP, its personnel, and vendors performed all of their obligations exceptionally at the Asylum Seeker Facilities.

52.     Despite major rain events in fall 2023, and snow events in winter 2024, the goods and services provided by GFP and its vendors experienced no major issues and the occupants at the Asylum Seeker Facilities experienced no adverse impacts.

53.     Garner further submitted extensions at the end of each 30-day period, and GFP provided Garner with additional discounts upon request.

54.     In fact, Garner, in February of 2024, affirmatively represented that it needed to, and did, pass GFP's discount directly to the City.  GFP justifiably relied on this specific representation of Garner that the entire discount was directly passed on to the City.

C. **Garner's New Leadership and Interference**

55.     On or about March 7, 2024, GFP received a telephone call from Garner's senior project manager, JP Temperilli, informing GFP that GFP's then-contact at Garner, Lawrence Crowe, had been terminated and that JP Temperilli and Carl Mugglin ("Mugglin") would be GFP's contacts at Garner moving forward.

56.     That same day, GFP contacted Mugglin and requested a contract extension for the services being provided by GFP and its vendors at Floyd Bennett Field by an additional 30 days.

57.     Later, on March 7, 2024, Mugglin emailed GFP and approved the 30-day extension which would run from March 10, 2024 to April 9, 2024.

58.     However, the next day, March 8, 2024, JP Temperilli emailed GFP demanding a breakdown of all pppd pricing secured by GFP for both Randall's Island and Floyd Bennett Field.

59.     Specifically, JP Temperilli requested a breakdown of the cost for: tents; power & HVAC; sanitation; personnel; fueling; and any ancillary support that was not included in the aforementioned categories.

60.     JP Temperilli falsely represented to GFP that this information was required in order to assess savings to pass on to the City, when in fact, upon information and belief, there was little, if any cost savings actually passed on to the City by Garner. Garner was keeping most, if not all, GFP's profits for its own selfish benefit.

61.    JP Temperilli called GFP and later followed up via email on March 8, 2024, to advise GFP that Garner now had their own trailer manufacturing facility for restroom trailers similar to those provided by GFP's vendor, and that Garner wanted to replace all shower and restroom trailers at Randall's Island with their own trailers. GFP later learned these representations were false.

62.    On March 10, 2024, in response to JP Temperilli's demand, GFP provided Garner with a breakdown of all pppd pricing secured for the Asylum Seeker Facilities.  GFP provided this information in the interest of good faith and in an effort to continue providing services at the most reasonable prices for the occupants housed at the Asylum Seeker Facilities.

63.    On March 12, 2024, after having the opportunity to review all of GFP's preferred pricing arrangements, JP Temperilli called GFP to advise that Garner wanted to replace virtually everything at Randall's Island with Garner's own equipment and asked that GFP only submit a bid for a discounted rate on the large tents and contents.

64.    On March 14, 2024, in an effort to retain at least a portion of the Randall's Island Asylum Seeker Facility, GFP submitted its bid for only the tent facilities.

65.    GFP also requested that it receive formal demobilization task orders, as required by the Master Agreement, for each resource, service, and asset which was to be demobilized to ensure an orderly transition of services in the interest of the wellbeing of the occupants of the Randall's Island Asylum Seeker Facility.

66.    On March 15, 2024, JP Temperilli acknowledged that no formal demobilization orders had yet been issued, but that Garner intended to issue formal demobilization orders for GFP and GFP's vendor's assets as well as all GFP personnel except for five staff members who were to assist in the transition of GFP assets at the Randall's Island Asylum Seeker Facility.

67.     JP Temperilli similarly confirmed later that same day, March 15, 2024, that to the extent that further demobilizations were set to occur, they would come in the form of formal demobilization task orders for the specific assets as required by Section 15.1 of the Master Agreement.

68.     However, unbeknownst to GFP, as early as March 14, 2024, Garner was already in direct communication and negotiations with many of GFP's vendors, including but not limited to Rentals to Go, and was actively utilizing GFP's confidential breakdown of preferred pricing to undercut GFP and completely remove it from the Asylum Seeker Facilities.

69.     For example, on March 14, 2024, Rentals to Go, a current GFP vendor, without any authorization from GFP and instead at Garner's direction, was already staged at Randall's Island and placed large quantities of shower and restroom trailers, as well as wastewater trucks at Randall's Island before GFP received any demobilization orders from Garner for its own assets at the Randall's Island Asylum Seeker Facility.

70.     Upon information and belief, at or around this same time, and unbeknownst to GFP, iRent Everything colluded with Garner to replace all existing tenting with their own testing at pricing well below industry standards, thereby undercutting GFP and all of its vendors by utilizing GFP's breakdown of preferred pricing.

71.     Thus, Rentals to Go and iRent Everything conspired with Garner to replace GFP assets and GFP vendors, including, among other vendors, Grannys Alliance and AAA Mobile Solutions, with Rentals to Go and iRent Everything's own assets.

72.     Defendants' actions were undertaken solely for the Defendants' benefit in order to remove GFP from the Asylum Seeker Facilities and increase the Defendants' profit, without any

regard for the safety and wellbeing of the occupants of the Asylum Seeker Facilities, and without regard to the professed economic interests of the City.

**D.** **Garner's Destruction of GFP Property, Demobilization Efforts, and the Transition Agreement**

73.    On March 15, 2024, Garner sent GFP an email outlining the demobilization process at the Randall's Island Asylum Seeker Facility and accepting the rate for just the large tents and their contents, but Garner unilaterally changed the duration of the Purchase Order from 30 days to 28 days.

74.    Notwithstanding Garner's desire to remove GFP from the Asylum Seeker Facilities, the reality was that Garner would be unable to simply demobilize GFP's provisions at the live Asylum Seeker Facilities because Garner had neither the assets nor the connections to be able to continue providing the basic fulfillment needs at the Asylum Seeker Facilities.[2]

75.    Thus, on March 17, 2024, at Garner's request, GFP provided Garner with pricing sheets for all GFP assets or GFP vendor assets for Garner to decide what assets it wanted to purchase in conjunction with the demobilization.

76.    Later that day, Garner sent GFP a list of the assets that it wished to purchase.

77.    However, once again, rather than using GFP's pricing sheets legitimately to pass on savings to the City and to determine which assets Garner wished to purchase, Garner, together with Rentals to Go and iRent Everything, conspired to undercut GFP's pricing with GFP's vendors and to cut GFP out of the Asylum Seeker Facilities entirely.

---

[2] Notably, At Floyd Bennett Field, the National Park Service would not allow any penetration into the national park ground, so GFP had to find solutions to meet this requirement and still provide a safe and secure environment for the families seeking shelter at the Floyd Bennett Field Asylum Seeker Facility.  It would be impossible for Garner to have been able to source and secure 50+ truckloads of heavy concrete ballasts required at Floyd Bennett Field in a timely manner.

78.     GFP later learned that Garner's representation that it was attempting to save the City money was a ruse. In fact, upon information and belief, little, if any savings were ever passed on to the City.

79.     On March 29, 2024, JP Temperilli informed GFP that Garner wished to take over and replace GFP at the Floyd Bennett Field Asylum Seeker Facility as well, starting on April 4, 2024, with the goal of completing that takeover on April 8, 2024.

80.     However, once again, in order to replace GFP at the Asylum Seeker Facilities, Garner needed to properly demobilize GFP's assets in accordance with the Master Agreement.

81.     Additionally, Garner was required to pay GFP all amounts due and not previously paid by Garner to GFP for goods furnished or services rendered by GFP which Garner had previously accepted.

82.     In order to facilitate this large transition while ensuring the safety of the occupants of the Asylum Seeker Facilities, Garner and GFP entered into an agreement (the "Transition Agreement") on April 5, 2024, by which Garner agreed pay to the balance it owed to GFP and penalties on unpaid amounts, and released GFP from any responsibility for Garner's actions. GFP also agreed to sell certain assets to Garner at the Floyd Bennett Field Asylum Seeker Facility.

83.     However, on April 6, 2024, within one day of the Transition Agreement's execution, and before Garner had formally demobilized many of GFP's Floyd Bennett Field assets, Rentals to Go – unbeknownst to GFP at the time – was already staged outside the Floyd Bennett Field Asylum Seeker Facility.

84.     This was one of many examples of Garner and Rentals to Go's proactive efforts to circumvent and remove GFP from the Asylum Seeker Facilities before GFP's own contracts with Rentals to Go had been terminated.

85.    On April 5, 2024, Garner began formally demobilizing GFP and GFP's vendor's assets at the Floyd Bennett Field Asylum Seeker Facility. Similarly on March 15, 2024, Garner began formally demobilizing GFP and GFP's vendor's assets at the Randall's Island Asylum Seeker Facility.  Attached as Exhibit 1 is a true and accurate list of all Demobilization Orders for the Randall's Island Asylum Seeker Facility; attached as Exhibit 2 is a true and accurate list of all Demobilization Orders for the Floyd Bennett Field Asylum Seeker Facility.

86.    Despite the assets demobilized by Garner between March 15, 2024 and April 8, 2024, as detailed in Exhibits 1 and 2, many assets remained live at the Randall's Island and Floyd Bennett Field Asylum Seeker Facilities for which GFP never received formal demobilization orders.

87.    GFP emailed Garner's on-site lead, Clint Feaster, on April 8, 2024, requesting clarity as to how Garner intended to proceed with demobilization of the assets as the parties' current contract cycle was set to expire at midnight, Feaster replied stating:

> Effective tomorrow, we would like to rent all remaining assets, aside from tenting, **on a daily basis** similar to that of the Randall's transition agreement. Please forward **a daily rate for all remaining assets**, and we will issue a PO. Regarding the tenting - we intend to rent the remainder on a 28-day billing cycle moving forward. If the client removes the tents before the end of a 28-day billing cycle, we would like to be prorated for number of days of the final billing cycle.

(emphasis added).

88.    Feaster's demand for daily rental rates was in direct violation of Section 3 of the Transition Agreement.

89.    Pursuant to the Transition Agreement, Garner was required to inform GFP by April 7, 2024, of any assets it wished to rent from GFP.  Additionally, section 3 of the Transition Agreement explicitly stated that Garner was required to provide GFP with at least 7 days written notice of its intent to demobilize any equipment it chose to rent.

16

90.     The Transition Agreement further provided that GFP was to invoice Garner for any rented equipment on a weekly basis and that Garner was to pay its invoices within 30 days of receipt.

91.     Garner's demand to rent GFP's remaining assets on a daily basis, which would provide Garner with the unilateral ability to cancel the parties' rental arrangement whenever it wished, was in direct violation of the Transition Agreement.

92.     Thereafter, on April 9, 2024, Garner once again reiterated that it was indeed unilaterally deciding to place GFP's contract with Garner on a day-to-day billing cycle in direct violation of the Transition Agreement.

93.     Mugglin emailed GFP and stated the following:

> I would like to clarify one point with regards to the tented infrastructure: ***We have never guaranteed a minimum rental period for any asset from any of our vendors***. Regardless of the requestor, assets are to be demobilized effective the date requested on their respective demobilization task order, with no additional costs incurred after the date specified.

(emphasis added).

94.     Mugglin was stating that it would rent all remaining assets at the Asylum Seeker Facilities on a day-to-day basis.

95.     Garner's attempt to unilaterally require the agreed-upon terms of the Transition Agreement by demanding that GFP provide Garner with a day-to-day rate to rent GFP and GFP's vendor's assets was commercially unreasonable. This is because Garner was well aware that GFP's contracts with its vendors provide for 30-day minimum performance guarantee periods which was both the industry custom and practice and consistent with Garner's own contracts with the City.

96.     If GFP was provided only a day-to-day contract, Garner could simply terminate GFP anytime and leave GFP financially on the hook for whatever remained due and owing to its subcontractors for the remainder of the 30-day performance guarantee then in effect.

97.     If Garner had initially only offered GFP day-to-day contracts for the Asylum Seeker Facilities, GFP would not have bid on or accepted the assignment because of the significant upfront costs incurred to build facilities such as the ones at Floyd Bennett Field and Randall's Island.

98.     If GFP had accepted the assignment based on contracts that proceeded on a day-to-day basis, the prices submitted by GFP would have been much higher.

99.     On April 9, 2024, Mugglin, on behalf of Garner, reiterated that while Garner and GFP previously had 30-day – later changed to 28-day – Purchase Orders issued on assets rented per site, Garner's position was that it was not responsible for the Purchase Orders in their entirety if that project ended before the Purchase Order totals were expired.

100.    Once again, this was in direct violation of Section 3 of the Transition Agreement.

101.    The Transition Agreement not only required Garner to provide GFP with 7 days written notice of Garner's intention to demobilize any of the rented assets, but it also obligated Garner to pay the full balance it owed to GFP under the relevant purchase orders and penalties on any unpaid amounts.

102.    Because of the commercial impossibility of Garner's attempted unilateral alteration of the terms of its agreements with GFP, in combination with Garner's earlier actions, GFP was effectively forced out of the Floyd Bennett Field and Randall's Island Asylum Seeker Facilities.

103.    On April 10, 2024, GFP directed its personnel and vendors to begin demobilizing their assets at the Floyd Bennett Field and Randall's Island Asylum Seeker Facilities to mitigate

current and future financial losses due to Garner's unilateral change in the contract terms to a day-to-day arrangement.

104.    Thereafter, on April 13, 2024, Rocky Sconda ("Sconda") – the owner of Main Attractions, GFP's primary tent vendor at Randall's Island Asylum Seeker Facility – sent GFP an email stating that Garner had contacted him directly via email on April 11, 2024, instructing him to invoice Garner directly and to effectively cut out GFP.

105.    Notably, Sconda informed GFP that Jonathan Proto ("Proto"), on behalf of iRent Everything, represented that Garner had placed Proto in charge of negotiating the deals with tent vendors.

106.    Proto further represented to Sconda that iRent everything would be taking over the tents at the Randall's Island Asylum Seeker Facility before GFP had received any demobilization orders for the tents.

107.    On April 14, 2024, Miles Lantier ("Lantier") of Lantier Tent Structures – a long time vendor and industry friend of GFP – sent GFP a text message stating that another one of GFP's tent vendors – Select Event Group – had been contacted by Garner and asked to invoice Garner directly, and thereby effectively cut out GFP.

108.    Lantier also informed GFP that Garner planned to have iRent Everything bring in its own tenting assets to the Floyd Bennett Field Asylum Seeker Facility and to demobilize GFP and GFP's vendors assets to replace them with iRent Everything's assets.

109.    Upon information and belief, Garner contacted every single one of GFP's vendors in an effort to undercut GFP and cut GFP entirely out of the Floyd Bennett Field and Randall's Island Asylum Seeker Facilities after making it commercially impossible for GFP to continue to

provide services for the Asylum Seeker Facilities and after having fraudulently obtained GFP confidential vendor pricing information.

110.    In most instances, Garner's direct contact with GFP's vendors was made prior to Garner issuing any demobilization requests to GFP for the relevant vendor assets. This meant that GFP's vendors were still under contract with GFP as of the date of Garner's direct contacts with these vendors.

111.    Upon information and belief, the contracts ultimately entered into by Garner with GFP's vendors made no mention of a day-to-day relationship, and instead provided 28-day performance periods, contrary to Garner's representation to GFP that a day-to-day relationship was required. Thus, Garner's insistence on a day-to-day relationship was simply a ruse by Garner to force GFP out of the Asylum Seeker Facilities by making GFP's work there economically unviable.

112.    In May 2024, Garner's then Executive Vice President, Danny Maldonado ("Maldonado"), informed GFP that he had been elevated to Executive Vice President of Garner and that JP Temperilli, John Temperilli, and Carl Mugglin had all recently resigned from Garner amidst allegations of egregious acts against Garner and its vendors.

113.    Garner ultimately admitted to GFP that under the prior leadership, Garner had wrongfully circumvented GFP in an effort to exclude and remove GFP from the Asylum Seeker Facilities to increase Garner's profits.

114.    On May 17, 2024, Maldonado sent GFP an email acknowledging "the position that the previous leadership has put us in." Similarly, Maldonado acknowledged that Garner's prior leadership, namely, ***former Garner Executive, JP Temperilli went around GFP and went directly***

***to GFP's tent vendor – Main Attractions*** – at Randall's Island in an attempt to cut GFP out of the project.

115.    Finally, on June 12, 2024, GFP received its first demobilization task order for 3,000 beds and four yurts still in place at Randall's Island.  Section 3.3 of the Master Agreement provided that upon receipt of a demobilization task order, GFP was required to "promptly remove its personnel, machinery, and/or equipment from the [Asylum Seeker Facility] …."

116.    However, before GFP could remove the 3,000 beds, Garner engaged in improper self-help and removed the beds without authorization.

117.    Garner placed the 3,000 beds outside in the rain before recklessly throwing them into trailers while the beds were still wet. GFP suffered a 100%, complete loss of the beds as a result.

118.    GFP continues to submit invoices to Garner for assets which remain on site at the Asylum Seeker Facilities and have not been demobilized. GFP also continues to invoice Garner for the agreed discounted rate for the tent facilities and their contents at the Randall's Island Asylum Seeker Facility.

119.    As of June 30, 2024, Garner was over 60 days past due on no less than $4,111,613.26 owed for assets remaining on site at the Randall's Island Asylum Seeker Facility and no less than $999,500.00 due for a demobilization fee approved on a Garner purchase order regarding the Floyd Bennett Field Asylum Seeker Facility.

**CAUSES OF ACTION**

**COUNT I.  TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE**
**Against All Defendants**

120.    GFP incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

121.    GFP had business relationships with: AAA Mobile Solutions; Casey Logistics LLC; Equipment Share; Granny's Alliance; Hightowers Petroleum Company-; Lantier Tent Structures; Main Attractions; Phoenix Pollution Control; Select Event Group; Sunbelt Rentals; Total Quality Logistics; Uline; United Rentals; Ultimate Dumpster; Propane Guy LLC; iRent Everything; Classico Building Maintenance Inc; Lola's Brunch, LLC; Mort Enterprises LLC; Rentals to Go; iRent Everything; and Temporary Wall Systems to provide various services in connection with the Floyd Bennett Field and Randall's Island Asylum Seeker Facilities (hereinafter the "GFP Vendors").

122.    Defendants were aware of GFP's probability of entering into and continuing business relationships with the GFP Vendors as demonstrated by the 30-day minimum guarantee performance periods GFP entered into with its vendors to retain the GFP Vendor's assets and discounted pricing. Defendant's conduct intentionally interfered with GFP's prospective business relationships with the GFP Vendors.

123.    Garner used dishonest, unfair, and improper means to interfere with GFP's prospective business relationships with the GFP Vendors by breaching the Transition Agreement and making the false representation that it required day-to-day relationships with its subcontractors and vendors which made GFP's work at the Asylum Seeker Facilities commercially unviable and forced GFP to inform its vendors to remove their assets from the Asylum Seeker Facilities.

124.    Additionally, Garner's actions in contacting GFP's vendors to ask them to invoice Garner directly in order to cut GFP out of the Asylum Seeker Facilities similarly was intended to cause, and did cause, injury to GFP's relationship with the GFP Vendors.

125.    Moreover, Garner's actions in conspiring with Rentals to Go and iRent Everything to replace GFP and GFP's vendors assets and to cut GFP out of the Asylum Seeker Facilities, similarly caused injury to GFP's relationship with the GFP Vendors including Rentals to Go and iRent Everything who themselves were GFP vendors prior to the unlawful, unjust, and tortious conduct described herein.

126.    Finally, Rentals to Go and iRent Everything's assistance to Garner in obtaining and reviewing GFP's confidential pricing information and/or contacting GFP's vendors directly, caused injury to GFP's relationship with the GFP Vendors.

127.    This interference by Defendants proximately caused GFP's damages. Accordingly, GFP has and will continue to incur actual damages and losses in an amount to be determined at trial which is in excess of the jurisdictional amount of $75,000 exclusive of interest and costs.

## COUNT II.  BREACH OF CONTRACT – TRANSITION AGREEMENT
### Against Garner

128.    GFP incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

129.    GFP and Garner entered into a valid and enforceable contract when the parties entered into the Transition Agreement, whereby: Garner agreed to purchase various GFP and GFP Vendor assets, rent any assets which Garner did not wish to demobilize at the Floyd Bennett Field Asylum Seeker Facility; and to pay the balance Garner owed to GFP on its outstanding payments as well as penalties on unpaid amounts.

130.    Garner breached the terms of the Transition Agreement by failing to provide GFP with the list of assets which Garner wished to rent by April 7, 2024.

131.    Garner further breached the Transition Agreement by failing to adhere to the parties agreed upon 7-day minimum notice for any rented asset demobilizations.

132.    Finally, Garner breached the Transition Agreement by failing to pay GFP for the goods and serves provided by GFP or the GFP Vendors owed pursuant to approved Purchase Orders and by failing to pay GFP for assets which remain at the Randall's Island Asylum Seeker Facility, the outstanding invoices as defined in section 3 of the Transition Agreement, and the $999,500.00 demobilization fee for the Floyd Bennett Field Asylum Seeker Facility.

133.    As outlined herein, as of June 30, 2024, Garner is over 60 days past due on no less than $4,111,613.26 due for assets remaining on site at the Randall's Island Asylum Seeker Facility and the $999,500.00 demobilization fee owed at the Floyd Bennett Field Asylum Seeker Facility.

134.    As a consequence of Garner's actions and/or omissions, GFP has been damaged, for which GFP now brings this suit.

135.    GFP alleges that all conditions precedent to the recovery of damages sought herein have occurred, been performed, or been waived.

## COUNT III.  BREACH OF CONTRACT – MASTER AGREEMENT
### Against Garner

136.    GFP incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

137.    GFP and Garner entered into valid and enforceable contracts such as the Master Agreement along with the subsequent Purchase Orders issued by Garner to GFP ("Purchase Orders"), whereby GFP agreed to supply services and/or personnel, equipment or material, to the extent ordered by Garner.

138.    Pursuant to the terms of the Master Agreement, along with the Purchase Orders, GFP was to be paid for the full value of the goods and services provided by GFP or its vendors.

139.    Garner breached the terms of the Master Agreement and Purchase Orders by, inter alia, failing to pay GFP the outstanding balance of the amounts owed for the Purchase Order as required by Section 15.1 of the Master Agreement.

140.    For example, as of June 30, 2024, Garner is over 60 days past due on no less than $4,111,613.26 owed for assets remaining on site at the Randall's Island Asylum Seeker Facility.

141.    Garner further breached section 3.3 of the Master Agreement by improperly engaging in self-help to remove the 3,000 beds which Garner demobilized on June 12, 2024. Garner placed the 3,000 beds outside in the rain before recklessly throwing them into trailers while the beds were still wet. GFP suffered a 100%, complete loss of the beds as a result.

142.    As a consequence of Garner's actions and/or omissions, GFP has been damaged, for which GFP now brings this suit.

143.    GFP alleges that all conditions precedent to the recovery of damages sought herein have occurred, been performed, or been waived.

## COUNT IV.  UNJUST ENRICHMENT
### Against Garner

144.    GFP incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

145.    As set forth above, Garner has engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GFP.

146.    When Garner demand that GFP provide Garner with its confidential pricing information in order to assess savings to be passed on to the City, GFP reasonably believed that it was assisting Garner is passing on savings to the City.

147. Rather than using GFP's confidential pricing information to pass on savings to the City as Garner represented, Garner willfully deceived GFP into providing Garner with its confidential pricing information and used the representation of assessing savings to be passed onto the City as a false pretext.

148. When Garner instead used GFP's confidential pricing information to cut GFP out of the Asylum Seeker Facilities by contracting directly with GFP's vendors, Garner acted with willful deceit.

149. Moreover, the haphazard manner in which Garner sought to quickly cut GFP out of the Asylum Seeker Facilities and to replace GFP and GFP's vendors' assets placed the occupants of the Asylum Seeker Facilities at significant risk to their health and wellbeing.

150. Garner has been enriched at GFP and the public's expense by profiting based upon the improper, unlawful, and unjust conduct described in detail herein.

151. The profits Garner obtained as a result of improperly cutting GFP out of the Asylum Seeker Facilities and by using GFP's confidential pricing information to undercut GFP and to contract with GFP's vendors directly constituted a benefit to Garner, which Garner voluntarily accepted notwithstanding their improper, unlawful, and unjust conduct as described herein.

152. Garner's retention of these profits violates fundamental principles of justice, equity and good conscience.

153. The Master Agreement and the Transition Agreement do not cover the dispute as it relates to Garner's improper retention of profits obtained as a result of improperly cutting GFP out of the Asylum Seeker Facilities.

154.    By reason of the above, Garner has been unjustly enriched in an amount to be determined at trial, but in no event less than the total amounts by which Garner has profited from the improper, unlawful, and unjust scheme as described herein.

### COUNT V. DECLARATORY JUDGMENT
### 28 U.S.C. §§ 2201 AND 2202
**Against Garner**

155.    GFP incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth at length herein.

156.    There is an actual case in controversy between GFP and Garner regarding the applicability and the enforceability of the forum selection clause in the Master Agreement.

157.    The forum selection clause in the Master Agreement is not applicable to GFP's New York state law claims for tortious interference with prospective economic advantage and unjust enrichment.

158.    Similarly, the forum selection clause is unenforceable as it relates to the breach of contract claims because the forum selection clause contravenes public policy; enforcement would be unreasonable and unjust; and/or trial in the forum selection clause's selected forum of Harris County, Texas would be so gravely difficult that GFP would, for all practical purposes, be deprived of its day in court.

159.    Accordingly, GFP requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the forum selection clause in the Master Agreement is not applicable to GFP's New York state law claims for tortious interference with prospective economic advantage and unjust enrichment and that the forum selection clause is not enforceable as it relates to the breach of contract claims.

### THE CITY OF NEW YORK – NOMINAL DEFENDANT

160.    At all times relevant to this action, the City owned the land upon which the Randall's Island Asylum Seeker Facility was located on.

161.    Similarly, the City was the party who was ultimately responsible for hiring Garner to broker services for the Asylum Seeker Facilities and thus was the intended beneficiary of Garner's actions as described herein.

162.    For example, in or around February 21, 2024, Garner requested significant discounts from GFP, purportedly for the benefit of and at the behest of the City.

163.    Additionally, in or around March 7, 2024, JP Temperilli, on behalf of Garner, represented that it required a breakdown of the cost for: tents; power & HVAC; sanitation; personnel; fueling; and any ancillary support that was not included in the aforementioned categories in order to assess savings to pass on to the City.

164.    GFP later learned that Garner used its confidential pricing information to cut GFP out of the Asylum Seeker Facilities.

165.    Additionally, a Garner employee represented to a GFP employee that Garner was taking over and replacing GFP in order to save the City money indicating that Garner's actions were motivated by and for the benefit of the City.

166.    Finally, the haphazard manner in which Garner demobilized GFP's assets by quickly removing and/or destroying GFP and GFP's vendors' property without adequate notice put the occupants of the Asylum Seeker Facilities at significant risk of bodily harm.

167.    The City, as the party responsible for hiring Garner and establishing the Asylum Seeker Facilities was obligated to ensure that the Asylum Seeker Facilities were run in a safe and orderly fashion.

168.    Despite this, the actions taken by Garner to cut GFP out of the Asylum Seeker Facilities, purportedly to benefit the City by saving the City money put the occupants of the Asylum Seeker Facilities at significant and unreasonable risk.

169.    The City is currently named as a nominal defendant in this action as the City was the intended third-party beneficiary of the actions taken by Garner as described in detail herein.

### PRAYER FOR RELIEF

GFP prays for Judgment against Garner as follows:

a.    For actual economic damages;

b.    For disgorgement of Garner's improperly obtained profits;

c.    For recovery of GFP's costs and reasonable attorneys' fees for bringing this action;

d.    Pre-and post-judgment interest as provided by law; and

e.    All such further relief, whether general or specific, either at law or in equity, to which Plaintiff may show itself justly entitled.

GFP prays for Judgment against Rentals to Go as follows:

a.    For actual economic damages;

b.    Pre-and post-judgment interest as provided by law; and

c.    All such further relief, whether general or specific, either at law or in equity, to which Plaintiff may show itself justly entitled.

GFP prays for Judgment against iRent Everything as follows:

a.    For actual economic damages;

b.    Pre-and post-judgment interest as provided by law; and

c.    All such further relief, whether general or specific, either at law or in equity, to which Plaintiff may show itself justly entitled.

Dated:  August 9, 2024

**FOX ROTHSCHILD LLP**

By: _/s/ Rory G. Greebel_

Rory G. Greebel, Esq.
Paul Richard Brown, Esq. (to be admitted *pro hac vice*)
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: (212) 878-7900
rgreebel@foxrothschild.com
paulbrown@foxrothschild.com

*Counsel for Plaintiff, GFP Enterprises LLC*